IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KURT HENRIKSEN and KATHY HENRIKSEN, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | )   No. 09 C 2398 |
| v. | ) |
| | )   Judge Robert M. Dow, Jr. |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Kurt and Kathy Henriksen brought this action under the Federal Tort Claims Act ("FTCA") following Kurt Henriksen's 2007 collision with a United States Postal Service vehicle. This case came before the Court for a three-day bench trial in May 2011. At trial, the Court heard the testimony of several witnesses, including Kurt and Kathy Henriksen, their son Gary, and Dr. John Frederick (Kurt's former employer). The Court also heard the testimony of four expert witnesses – two per side – on issues related to Kurt's injury, treatment, pain, and the permanency of the injury. Defendant United States does not contest that the driver of the Postal Service vehicle caused the collision with Kurt Henriksen; however, Defendant denies that the collision caused all of the injuries now claimed by Plaintiffs and further denies that it is liable to Plaintiffs for the damages sought on the grounds that the damages are excessive and not supported by the evidence. Thus, the main issue to be decided by the Court is the nature, extent, and duration of the damages incurred by Kurt Henriksen as a result of injuries sustained in the August 2007 collision. The Court sets forth below its findings of fact and conclusions of law, as

required under Federal Rule of Civil Procedure 52(a). The facts are drawn from the documentary record in the case and the evidence and testimony presented at trial.

## I.  Background

### A.  Stipulated Facts

On August 7, 2007, Dolores Soukup ("Soukup") was employed by the Postal Service as a rural mail carrier and was acting within the scope of her employment. Soukup was on her mail delivery route driving her vehicle northbound along 104th Street in Peotone, Illinois. Plaintiff Kurt Henriksen was driving his vehicle westbound along Eagle Lake Road. Northbound traffic on 104th Street at its intersection with Eagle Lake Road was regulated by a stop sign and yielded the right of way to cross traffic on Eagle Lake Road, which was uncontrolled. After stopping at the intersection of Eagle Lake Road and 104th Street, Soukup proceeded to enter the intersection and drove into the path of Kurt, causing a collision between the two vehicles.

The United States owed a duty to Plaintiffs and breached that duty when Soukup caused a collision with Kurt's vehicle. The medical bills incurred by Kurt Henriksen as a result of the collision totaled $5,132.00, after a set-off of $5,676.40 previously paid by the United States. The property damage to Plaintiff's vehicle was $4,775.00. As set forth in Plaintiffs' Rule 26(a)(2) report, Dr. Charles Linke calculated the net present cash value of Kurt Henriksen's lost wages and benefits if he had continued working as a lab manager at the University of Chicago. (J000402-419).[1] The parties stipulated that if Dr. Linke had been called to testify at trial, he would have testified to the opinions and conclusions set forth in his report and deposition testimony. The parties further stipulated to the admission of his report, current curriculum vitae,

---

[1]  "Tr." citations refer to the trial transcript by page number. "J" citations refer to Bates-numbered pages in the parties' joint exhibit binder.

and deposition transcript into evidence. See Plaintiff's Exhibits 6 and 7 (J000332-335, J000402-443).

## B. Additional Facts Surrounding the Collision

At the time of the collision, Kurt was wearing a seatbelt. Tr. 116. He did not lose consciousness and the air bag did not deploy. Tr. 116. However, he testified that he felt the immediate onset of pain in his back, lower back, and left leg and also experienced pain on his right side. Tr. 76. According to Kurt, that was the first time that he'd ever experienced pain in his right leg and foot. Tr. 76. Kurt called for an ambulance and was taken to a local hospital where an x-ray was taken of his back, which did not reveal any broken bones or fractures, but did note his degenerative disc disease. Tr. 116; J000150. Kurt was discharged that same day. Tr. 117.

## C. Kurt's Life Prior to August 2007 Collision

### 1. Personal Life

Kurt was born on March 8, 1954 and is 58 years old. Tr. 18. He has been married to Plaintiff Kathy Henriksen for 37 years. Tr. 18. They have two children and one granddaughter. After high school, Kurt attended a two-year course at Moraine Valley Community College and earned a certificate as a robotics technician. Tr. 20. After he got married, Kurt took a job with Hollymatic, a company that manufacturers the machines that make hamburger patties. Tr. 21. He worked for Hollymatic for five years, learning how to operate machine shop tools and worked his way to the top of the machine shop. Tr. 22.

In 1986, Kurt was hired at the University of Chicago as manager of the teaching labs for the Physical Sciences Collegiate Division. Tr. 22. He held that position until he stopped working at the University of Chicago in 2010. Tr. 22, 92. His job involved supporting the

Department of Astronomy and Astrophysics and the Department of Geophysical Sciences. Tr. 22. As the manager of the teaching labs, Kurt's duties and responsibilities included supporting the faculty in lectures, setting up the lecture demonstrations, building equipment for demonstrations or labs, securing equipment from vendors, and breaking down labs and demonstrations after completion. Tr. 23-24. His job at the University of Chicago required him to be on his feet constantly—gathering materials, lifting materials, and moving equipment from room to room. Tr. 25-26. The lectures and labs that he supported were not in the same building and required Kurt Henriksen to move to and from up to five different buildings per day. Tr. 27.

Until the collision, Kurt planned on working at the University of Chicago until he was 65 or 70 years old. Tr. 44. As lab manager at the University of Chicago in 2006, Kurt earned $55,414 in wages and salary; in 2007, he earned $57,557; and in 2008, he earned $58,917.00. Tr. 46-47. These figures do not include the value of the benefits provided by the University of Chicago. The value of the benefits provided by the University is included in Dr. Linke's materials, which the Court has reviewed.

In 1994, Kurt and his wife moved to a 10-acre farm in Peotone, Illinois. Tr. 30. They wanted a bigger place to explore their hobbies, including raising emu and working on cars. Before the collision, Kurt built a large deck on his house, installed a swimming pool, built a deck around the pool, landscaped the yard, built a pole barn, installed a concrete floor for the pole barn, and did the electrical and drywall inside the pole barn. Tr. 47-62. Before the collision and after he began seeing Dr. Fisher, Kurt built a battery building, a wind generator, and a short shed for animals. He also installed the fencing on the property and approximately 400 feet of wooden sidewalks that traverse his property and built a pond on his property to collect water for use on

the farm.  See generally Tr. 57-61.  Immediately prior to the collision in 2007, the Henriksens had approximately a dozen animals on their farm.  Tr. 175.

Kurt and Kathy also own a lake house in Shipshewana, Indiana, that they purchased shortly after he began working at the University of Chicago.  Tr. 31-32.  Before the collision, they regularly went to their lake house.  Tr. 65.  Kurt built a deck and a great room and landscaped the yard.  Tr. 66.  When visiting the lake house, the Henriksens would go to the open air flea market and antique and collectibles auction.  Tr. 67.  Attending the flea market and auction would last all day, from six to nine hours.  Tr. 68.  Before the collision, the Henriksens would regularly drive to places like Cripple Creek, Colorado, Las Vegas, Nevada, Key West, Florida, and places in Arizona.  Tr. 69.

2.    *Medical Condition Prior to Collision*

In 1989, Kurt fell down a set of steps at the University of Chicago and injured his lower back.  Tr. 33.  An MRI scan showed that he sustained a large herniation at the L4-5 disc in his lower spine along with other small disc abnormalities as a result of the fall.  Tr. 213.  The MRI also revealed that Kurt suffered two disc fragments in his back and a compressed nerve root.  Tr. 226.  As a result of his back injury, Kurt underwent a lumbar discectomy in April 1989, which was performed by Dr. Frederick Brown, a neurosurgeon at the University of Chicago.  Tr. 213.  Following the surgery, Kurt continued to experience low back and radiating left leg pain with continued foot numbness and weakness.  Tr. 214.  Subsequent MRIs taken in the months after the surgery showed the formation of scar tissue at the area of the surgery.  Tr. 214.  Kurt was ultimately diagnosed with failed back syndrome.  Tr. 371.  However, following the surgery, Kurt returned to work at the University of Chicago with no restrictions.  Tr. 34.

After the surgery, Kurt developed symptoms of pain in his low back at the surgery site and pain that would go down the sciatic nerve in his left leg. Tr. 34. He returned to see Dr. Brown, who referred him to Dr. Friedl Pantle-Fisher ("Dr. Fisher"), a pain management specialist at the University of Chicago Pain Clinic. Tr. 35. When Kurt first saw Dr. Fisher in the mid-1990's, his symptoms were the same as those described to Dr. Brown: pain in his back at the surgery site, pain down the sciatic nerve in his left leg, and occasional pain in his left foot. Tr. 35. As reflected in the progress notes from each visit, his diagnosis during that period was reported by Dr. Fisher as failed back syndrome (or post laminectomy syndrome) and lumbar radiculopathy. Tr. 371.

Kurt's back problems persisted over the years. In 1994, Kurt underwent another MRI, which noted scar tissue anterior to the thecal sac causing minimal flattening and that the scar tissue was inseparable from the S1 nerve root. Tr. 215. The MRI specifically noted that the scar tissue was adjacent to the left S1 nerve root. Tr. 214. Kurt suffered a second serious fall in 2003 and went to the emergency room. Tr. 262-63. Another MRI was performed at that time, noting degenerative disc disease, scar tissue from his 1989 surgery, and facet hypertrophy, all of which contributed to Kurt's chronic lower back and left leg pain.

Kurt's pain was variable. Tr. 36. During his various visits with Dr. Fisher prior to August 2007, Kurt would be asked to report a pain score, which described the extent or severity of his pain on that occasion. During his visits with Dr. Fisher between 1995 and 2007, Kurt often reported pain scores in the 6, 7, or 8 out of 10 range. Tr. 361. On November 18, 2003, shortly after his fall, Kurt reported a pain score of 10 out of 10. Tr. 362. When using words instead of numbers, Kurt at times described his lower back pain as "constant" and "sharp." Tr. 368; Tr. 366. On May 4, 2007, three months before the accident, Kurt reported that his pain was

mostly controlled, except during brief periods of increased activity, which sometimes resulted in him being bedridden for extended periods. Tr. 369. From the time that he first saw Dr. Fisher in the mid-nineties until the date of the collision in 2007, he had approximately six episodes where the pain would flare up and he was bed- or couch-ridden, causing him to miss work. Tr. 36. Notwithstanding his chronic (although usually controlled) pain resulting from failed back syndrome and lumbar radiculopathy, Kurt continued to work full time as a lab manager at the University of Chicago. Tr. 370-71.

There is no evidence that Kurt experienced right foot or right leg pain prior to the accident. Rather, the pain was associated with his left side. Dr. Fisher's primary treatment of Kurt's pain symptoms over the years consisted of prescribing a pain medication called Oramorph, an orally administered morphine. Tr. 376, 389. In 1995, his dosage was 30mg. Tr. 379. By 1997, it was increased to 60mg. Tr. 380. By September 2002, it was 100mg. Tr. 380. There was a discrepancy between the testimony and the records as to whether the dosage was increased to 115mg or 150mg in 2003 and beyond. According to Dr. Fisher, it was never increased to 150mg, because the available dosage amounts do not yield 150mg. Rather, she testified that she believed the notation of 150mg in some of the records to be a typographical error and that prior to the accident, his highest dosage was 115mg (a 100mg pill plus a 15mg pill). The Court finds this testimony to be credible.

Kurt last saw Dr. Fisher before the August 7, 2007 collision in May 2007. He was working full-time and taking care of his farm. Dr. Fisher instructed him to come back to see her in six months. Tr. 72-73.

### D. Kurt's Condition Following the August 2007 Collision

#### 1. *Medical condition*

Following the collision, Kurt saw Dr. Brown on August 20, 2007. Tr. 217. At that time, Kurt was complaining of back pain and pain radiating down both legs. Tr. 232. Kurt reported to Dr. Brown that prior to the accident, his pain score was 3 to 5 of 10 and that now the pain in his back felt like an 8. Tr. 235. Dr. Brown ordered another MRI. Tr. 218. The MRI results noted that Kurt had very advanced degenerative disc diseased at L4-5 and a minimal annular tear at the left paramedian area. Tr. 219. Dr. Brown agreed with the findings stated in the radiologist's report that the post-collision MRI did not show any significant changes in the condition of Kurt's back compared to the MRI results from 2003. Tr. 220, 232. The August 2007 MRI notes bone on bone, which, according to Dr. Brown, "can be" a very severe condition causing back pain. Tr. 231. However, no evidence was presented that indicated that the "bone on bone" findings were a cause of Kurt's right foot pain. Dr. Brown instructed Kurt to return to the pain clinic to see Dr. Fisher. Tr. 79.

Kurt saw Dr. Fisher at the end of August 2007, and had pain in his left side, low back, and right foot. Tr. 79. At that time, Henrisken reported a pain score of 8 or 9 of 10. Tr. 373. Dr. Fisher ordered an EMG (nerve conduction) study to attempt to identify the source of Kurt's pain symptoms in his right leg and foot. Tr. 403-04. The EMG was negative, showing no significant abnormalities and no definite electrophysiologic evidence of lumbosacral radiculopathy. Tr. 404. During his various follow-up visits with Dr. Fisher after the collision and up through January 2010, Kurt generally reported pain scores in the 7 to 8.5 range. Tr. 373. His complaints of pain during each of those visits included low back and radicular pain in both legs and neuropathic pain in the lower extremity.

Kurt testified that his right foot felt like pins and needles all the time. Tr. 79. He had numbness in his foot and a limited range of motion. Tr. 79. The pain was located on the sole of

his foot and his toes, but not in his heel. The top of his right foot also was numb. Tr. 80. Kurt testified that since the date of the collision, the location of the pain and symptoms in his right foot have not changed. Tr. 81. He testified that his ability to walk has been affected because of excruciating, constant pain in his right foot and he now uses a cane to walk. Tr. 81-82. The pain affects his balance and ability to stand, squat, stoop, lift things, and go up and down stairs. Tr. 83-85. Kurt also has trouble sleeping due to the pain. According to Kurt, the pain he experiences in his right foot is much worse than the pain he experienced in his low back and left leg before the collision. Tr. 86.

In an attempt to relieve some of the pain he experiences in his right foot, Kurt wears a gatekeeper shoe, a device with a thick, rubber, honeycomb-type of material on the bottom that helps absorb pressure. Tr. 87. He also has modified his cars because of the pain he experiences when putting pressure on the gas pedal with his right foot. He installed looser throttle springs so that it takes less pressure to push on the gas pedal. Tr. 88.

Beyond pain medication, Dr. Fisher recommended other therapies to treat Kurt's pain symptoms. Tr. 392. She recommended steroid injections, a common procedure used to treat nerve-based pain that carries reasonable risks. Tr. 392-93. Dr. Fisher thought the injections might help alleviate his reported pain, but Kurt was unwilling to do the procedure because it had not helped him in the past and because it could result in additional nerve injury. Dr. Fisher thought it was still worth trying because Kurt was experiencing new pain symptoms, but Kurt refused. Tr. 395. Dr. Fisher also recommended a dorsal column stimulator, but Kurt was unwilling to try it. Tr. 395. To obtain a dorsal column stimulator, Kurt would have had to undergo a back surgery that may have required cutting bone and ligament to fixate the leads. Tr. 434. Aside from the steroid injections and dorsal column stimulator, Kurt tried the treatments

recommended by Dr. Fisher—different medications, physical therapy, and neuropathic pain cream—but Kurt stated that the medications either made him dizzy or bothered his stomach, the physical therapy exacerbated his pain, and the cream did not provide any relief. Tr. 395-96. Kurt only attempted physical therapy twice, and he was never able to complete a full session.[2]

Kurt saw Dr. Fisher again on December 10, 2010. At that time his chief complaints were lumbar radicuclar pain, low back pain, and neuropathic pain in the right lower extremity. Tr. 422. Kurt had been making complaints regarding lumbar radicular pain and low back pain since his back surgery in 1989. Tr. 422. On February 16, 2011, for the first time since beginning treatment with Dr. Fisher in the 1990s, Kurt did not report any pain in his left leg or low back. Tr. 424-25. Dr. Fisher described his improvement in those areas to be a fundamental change. Tr. 425.

At the following visit on April 18, 2011 (less than a month before trial), Kurt's complaint became even more limited; it was listed for the first time in the progress note as "neuropathic pain right foot" instead of right lower extremity. Tr. 425. This is the fist time since Dr. Fisher began treating Kurt in the 1990s that her progress note lists neuropathic pain as the one and only assessment. Tr. 426. Based on his subjective reports, all of Kurt's prior pain symptoms, including left radiculopathy, failed back syndrome, and low back pain, have resolved and turned out not to be permanent. Tr. 426.

### 2. *Personal and work life*

Kurt continued to work at the University of Chicago for 2.5 years following the collision. Dr. John Frederick is a professor of Atmospheric Science and Master of the Physical Sciences

---

[2]    Dr. Fisher never recommended a gaitkeeper shoe for Henriksen; he found that for himself on the internet. Tr. 402. Nor did Dr. Fisher ever recommend that Henriksen use a walking cane; he also began using one on his own. Tr. 402-03.

Collegiate Division at the University of Chicago and was Kurt's supervisor. Dr. Frederick confirmed Kurt's duties at the University of Chicago and testified that, prior to the 2007 collision, he did not observe Kurt to have any limitation in his ability to perform the duties and responsibilities of being a lab manager nor did he observe Kurt limping on campus, having difficulty walking, or having difficulty going up and down stairs. Tr. 258. However, after the collision, Dr. Frederick observed a change in Kurt's performance at work. Kurt started missing days, was having difficulty walking and going up and down stairs, and had a noticeable limp. It was obvious to Dr. Frederick that Kurt was in considerable pain at that time that he quit in January 2010. Tr. 263.

Despite Dr. Frederick's observations, Kurt received a written performance evaluation in June 2008 (almost a year after the accident) signed by Dr. John Frederick, in which he received the highest rating—excellent—in virtually every category, including in every category relating to "dependability" and "quality and quantity of work." Tr. 272. Kurt received another written performance evaluation in July 2009, where he received a rating of "excellent" in every category, including dependability and quality and quantity of work. Tr. 273-74. In that evaluation, Dr. Frederick wrote that "Kurt has a large body of technical knowledge and experience that he uses to keep the labs running smoothly. He consistently goes beyond the call of duty to ensure that all operates efficiently." Tr. 273. Apart from occasions where Kurt would call Dr. Frederick to report that he was unable to come into work, they never had any discussions with respect to making work accommodations in light of Kurt's injury. Tr. 280. Despite these performance reviews, in 2010, Kurt felt that he could no longer continue working as a lab manager and he resigned from his position.

According to Kurt, he stopped working because he could not endure the pain any longer. Tr. 92. Because of the pain in his foot, he was unable to get from building to building in a timely fashion, move equipment, or make it up and down the stairs between his office and the lecture halls. Tr. 90-93. Kurt does not plan to return to the University of Chicago, and, since leaving, he has not applied for any other jobs. Tr. 93.

According to Kurt, the symptoms that he was experiencing in his low back, left leg, and left foot following the collision (and before) have resolved. He attributes this to his decreased activity level, including no longer working at the University of Chicago, as well as the increased dosage of Oramorph. Tr. 90.

When Kurt stopped working in January 2010, he applied for disability status. Tr. 92. Dr. Fisher signed his disability application. Tr. 359-60. She left blank sections on the application related to his functional capacity because she understood that those sections required an objective evaluation by a trained person who could submit a functional capacity evaluation. Tr. 411. Kurt never underwent a functional capacity evaluation or attempted another work hardening program prior to submitting his claim for long-term disability. Tr. 417, 421. Although Kurt now attributes his disability exclusively to his right foot pain, in 2010, Dr. Fisher listed on his disability application "failed back syndrome" and "lumbar radiculopathy" as among the reasons that he should be considered disabled.

Since the collision, Kurt no longer mows the grass, performs upkeep on his property, or takes care of the animals because of the pain in his right foot. Tr. 94-95. The Henriksens no longer go to their lake house in Shipsewana, Indiana, take vacations, or attend the flea market and auction. Tr. 99-100. He no longer has sexual relations with his wife due to the pain in his

right foot.  Kurt testified that his current condition—and the way it affected his active lifestyle—has left him feeling frustrated and depressed.

### 3.    *Kurt's family*

Kathy Marie Henriksen was born on September 30, 1955.  Kathy has been married to Kurt for 37 years.  Kathy was diagnosed with depression 15 years ago when she lost her employment as a grocery store clerk as a result of the company filing for bankruptcy.  Tr. 172.  Since the collision, Kathy testified that Kurt too has been depressed.  Kathy testified that the farm has deteriorated because Kurt doesn't do anything anymore.  Tr. 151.  The Henriksens no longer take walks around their property or grill out in the evenings.  Kathy confirmed that Kurt has trouble sleeping and that they no longer have sexual relations and also noted that he moans in his sleep.  Kathy described a very different life for the Henriksens after the collision.

Gary Henriksen, Kurt's son, testified that prior to the accident, his dad's activity level was "from sun-up to sundown."  Tr. 181.  Gary worked with his dad at the University of Chicago from 2000 to 2008.  Tr. 185.  Before the collision, his dad worked full-time, and Gary never observed him having difficulty with the duties and responsibilities of his job.  Following the collision, Gary observed his dad limping and having difficulty walking, with his balance, and going up and down stairs.  Tr. 191.  Gary also noted his dad's use of a cane.  Gary testified that his dad can no longer take care of the farm.

### D.    **Expert testimony**

### 1.    *Plaintiffs' experts*

#### a.    Dr. Frederick D. Brown

Frederick D. Brown, a board-certified neurosurgeon, received his undergraduate education at Ohio State University, went to medical school at Ohio State University, interned at

the University of Chicago, and then completed a neurosurgery residency in 1978. Tr. 207-08. Dr. Brown is currently Associate Professor of Surgery within the Section of Neurosurgery, Associate Chief of the Section of Neurosurgery, and the Program Director for the Neurosurgical Residency at the University of Chicago. Tr. 208. Dr. Brown's particular area of focus within the field of neurosurgery is the spine. Tr. P. 208. Over the past 10 years, Dr. Brown typically saw 1,200 to 1,300 patients per year and operated approximately 200 times per year. Tr. 210. Ninety percent of those involve the spine, and of those spinal operations, approximately three-fourths involve the lumbar spine. Tr. 210.

Dr. Brown's involvement with Kurt began in 1989 in conjunction with an MRI taken of Kurt's lumbar spine. Tr. 212. The MRI showed a very large disc herniation arising from the L4-5 disc, with some other small disc abnormalities, and Dr. Brown eventually recommended surgery. Tr. 213. Following the surgery, Dr. Brown ordered another MRI because Kurt still had some low back and left leg pain with continued foot numbness and weakness. Tr. 214. The MRI (performed in October 1989) showed that most of the herniated disc had been removed and that there was residual material consistent with scar tissue, which is not unusual. Tr. 214.

Dr. Brown's next contact with Kurt was in December 1994, when he ordered another MRI. Tr. 214. The MRI showed that Kurt had no significant disc bulges or herniations, that he previously underwent a L4 laminectomy, and that he had a small amount of scar tissue at L4-5 and L5-S1. Tr. 214-15. Dr. Brown opined that the scar tissue was a possible explanation for why he had some continuing pain. TR. 215. Another MRI was ordered on November 25, 2003, which showed degenerative disc and facet hypertrophy at L4-5, but no spinal stenosis or neural foraminal compromise. Tr. 216. At L5-S1 it showed facet hypertrophy, but no significant spinal stenosis or neural foraminal compromise. Tr. 216.

Following the collision, Dr. Brown saw Kurt once. In forming his opinions about the cause of Kurt's right foot pain, Dr. Brown relied on the subjective history provided by Kurt, because the post-collision MRI did not provide an explanation for the right foot pain. When Dr. Brown saw Kurt on August 20, 2007, Kurt had a chief complaint of low back and leg pain. Tr. 217. Kurt told Dr. Brown that prior to the motor vehicle accident, his low back pain was 3 to 5 on a scale of 1 to 10, and following the accident, the pain was about an 8 on a scale of 1 to 10. Tr. 217. Kurt described the pain as having a constant, burning, sharp, shooting, stabbing quality, which was aggravated by most movements. Tr. 217. Dr. Brown's physical examination of Kurt showed a well-healed scar in the midline and posteriorly moderate tenderness to palpation. Tr. 218. Kurt's straight leg raising was limited to about 45 degrees on either side, and the remainder of the findings were normal. Tr. 218. Dr. Brown also ordered an MRI. Comparing the MRIs performed in 2007, 2003, and 1994, Dr. Brown noted that there wasn't a significant difference between the results, except for maybe a "little bit more degeneration" in the third one. Tr. 219-20.

Dr. Brown opined that the automobile accident of August 7, 2007 likely aggravated the preexisting condition in Kurt's lumbar spine and caused the increase of pain in Kurt's low back and left leg. Tr. 221. Dr. Brown based his opinion on Kurt's history, the fact that he had preexisting scar tissue, and the fact that he was in an accident and the complaints began after the accident. Thus, Dr. Brown concluded that there was a causal relationship between when the pain began and the motor vehicle accident. Tr. 221.

Dr. Brown also opined that the injury that Kurt sustained to his right leg likely was caused by the accident and likely is permanent. Tr. 221-25. While he admitted that the results from the X-ray taken at the hospital immediately after the accident did not show evidence of an

injury that might explain Kurt's right foot pain, he based his opinion on Kurt's medical history, subjective history (relayed by Kurt), the fact that he did not complain of right leg pain prior to the accident, and the fact that he had preexisting scar tissue that could set him up for a stretching of the nerve or a disturbance of the nerve as a result of the motor vehicle accident.[3] Tr. 221-22, 230. Dr. Brown opined that the findings on the MRIs of 1994 or 2003 do not indicate that Kurt necessarily was going to have pain on his right side regardless of whether he was involved in an accident. Tr. 223. Dr. Brown didn't see anything on those MRIs that he would expect to lead to right-sided symptoms because the degenerative changes on the right side were minimal. Tr. 224. Dr. Brown based his opinion that the right side condition is likely permanent on the fact that the pain has continued beyond two years after the injury (falling into most people's definition of permanency or chronicity). Tr. 225. Dr. Brown also testified that he cannot surgically cure or repair the problem. Tr. 225.

Given that Kurt did not have any pain on the right side prior to the accident, Dr. Brown also testified that it is likely that the cause of the problems for Kurt's right leg and foot following the accident in 2007 are separate from the left lower extremity and low back condition Kurt had been experiencing. Tr. 225-26. Because the scarring after the surgery in 1989 was left sided and ventral, Dr. Brown would expect that pain to be predominantly left side; however, the fact that there is some ventral means that the right side could become symptomatic given the right circumstances, for example, a trauma. Tr. 246. Dr. Brown testified that the injuries Kurt suffered in his lower back before the accident were not likely to disappear after 18 years; rather,

---

[3] Dr. Brown testified that in an individual who has not had back surgery, the nerves are free to move in and out of the spinal canal small distances; however, if an individual has had lumbar disc surgery, it causes a scarring around the nerve, which, in a sense, "tethers" the nerve so that it can't move freely. Rather, it's more likely to be subjected to yanking or stretching with sudden movements.

they typically get worse over time. Tr. 238-39. However, he also testified that if one pain is extremely severe, it will override the perception of pain on the other side.

b.     Dr. Friedl Pantle-Fisher

Dr. Friedl Pantle-Fisher is a board certified anesthesiologist and pain management specialist who was Kurt's treating physician. She first began treating Kurt around 1994 and has treated him continuously since that time. Tr. 293. Dr. Fisher testified that she did not believe Kurt malingered or misrepresented his symptoms and that his complaints of pain generally have correlated with her observations of him. Tr. 295. Prior to the collision, Dr. Fisher treated Kurt for low back and left leg pain with a medication named Oramorph, the dosage of which was never more than 115mg every 8 hours. Tr. 302. The last visit Dr. Fisher had with Kurt before the collision was on May 4, 2007, and she believed his low back and left leg pain to be controlled by the Oramorph. Tr. 307. Dr. Fisher instructed Kurt to return in six months. Prior to the collision, Kurt did not complain to her of right leg pain or right foot pain and she never treated him for right leg pain or right foot pain. Tr. 313.

At the first visit following the collision, Kurt complained of pain radiating down both lower extremities and numbness in both feet and on the bottoms of his feet, including a pins-and-needles sensation in his right foot with loss of balance. Tr. 315-18. Kurt described his pain as sharp and stabbing in his back and stabbing and burning in the lower extremities. Tr. 316-18. He told Dr. Fisher that the pain in his right lower extremity was much worse than the pain in his left lower extremity. Tr. 316-317. Dr. Fisher testified that Kurt's right foot pain has a neuropathic component, which causes different pain qualities that can be perceived as stronger. Tr. 326-28. According to Dr. Fisher, Kurt's description of his pain—as stabbing, throbbing, stinging, numbing and tingling pain—was consistent with neuropathic pain. Tr. 330-31.

Following the collision, Dr. Fisher increased his dosage of Oramorph from 115mg to 145mg. Tr. 319. Then, in July 2009, she increased the dose of from 145mg to 160mg. Tr. 332.

In January 2010, Kurt told Dr. Fisher that his left leg and low back symptoms had improved and that he still experienced a pins-and-needles sensation on the sole of his right foot and toes. Tr. 333. In December 2010, Dr. Fisher increased Kurt's Oramorph to 180mg. Tr. 334. She also prescribed a topical cream for Kurt, but the cream did not provide him with any relief. Tr. 339. Dr. Fisher believes that Kurt's low back and left leg symptoms have resolved as a result of decreased activity and increased doses of Oramorph. Tr. 339-340.

Based on Kurt's reports of increased pain and his description of the collision, Dr. Fisher opined that Kurt aggravated the preexisting condition in his lumbar spine in the August 7, 2007 collision and that the injuries he sustained caused an increase in his back and left leg and foot pain. Tr. 345-46. Dr. Fisher also opined that the injuries sustained in the collision caused his right foot symptoms and that these symptoms—pain, numbness, tingling and burning—are permanent. Tr. 347. This opinion was based on the presence of consistent right foot pain (in the face of increasing doses of pain medication) since the collision and the fact that the pain is neuropathic in nature, which can be difficult to treat and resolve. Tr. 348. Her opinion is not based on the post-accident EMG, as Dr. Fisher acknowledged that the EMG showed no significant abnormalities. She also acknowledged that Kurt did not complete the physical therapy that she recommended for him. Tr. 405.

Dr. Fisher believes that Kurt will not be able to return to work at the University of Chicago as a result of the injuries he sustained in the collision. She had no opinion regarding Kurt's ability to work in any other jobs outside of the University of Chicago. Tr. 417. She also conceded that she is not qualified to render an opinion as to a person's "disability" status for

purposes of a functional capacity evaluation; rather, she merely gave her opinion as to whether she thinks Kurt will be able to work in the future.[4]  Dr. Fisher based her assessment on the following facts:  Kurt walks with a cane, cannot walk up and down stairs, has great difficulty taking one step at a time, stumbles, has difficulty feeling the ground under his right foot, has difficulty sitting, standing or walking, and has constant, "excruciating" pain in his right foot.  Tr. 351.  Dr. Fisher's opinions are based on her knowledge of Kurt's current condition and her observations of him over the course of 33 visits since the collision.  Tr. 358.

2.  *Defendant's experts*

a.  Dr. Daniel Hurley

Dr. Daniel Hurley is a physician with board certification in physical medicine and rehabilitation (also known as physiatry) and sub-specialization in pain management.  Tr. 452.  Over the course of his career, he has diagnosed, treated, and performed physical examinations on thousands of patients with neurologic disorders of the spine and lower extremities, including radiculopathy, neuropathy, and failed back syndrome.  Tr. 460.  In the mid-1990s, Dr. Hurley joined the Chicago Institute of Neurosurgery and Neuro Research (CINN), where he treated patients and ran a pain management and spine injection fellowship.  Tr. 459.  He currently maintains a clinical practice at North Shore University Health System and Medical Group.  Tr. 459.

Dr. Hurley saw Kurt one time, when he performed an IME on him on Oct. 12, 2010.[5]  Tr. 475.  In preparation for the IME, Dr. Hurley reviewed some of Kurt's medical records, including

---

[4]  Kurt did not undergo an objective functional capacity evaluation.

[5]  Defendant retained Dr. Hurley as an expert witness in this matter.  Dr. Hurley charged $1,100 for the IME and his review of certain records in conjunction with the IME.  He charged $1,000 per hour for his deposition in this case and $250 per every 15 minutes that he met with the defense counsel prior to trial.  Finally, he charged a fee of $1,500 per hour with a 4-hour minimum for his trial testimony.

records from the University of Chicago dated through October 2008, records from Chicago Sports & Spine dated through December 2009, emergency records from St. Mary's Hospital, a summary of Kurt's medical history and treatment prepared by Dr. Fisher, an MRI report from August 7, 2007, and Kurt's EMG report from November 2007. Tr. 465. He did not review any medical records prepared after October 2008. He did not review any of the depositions taken in this case, except his own.

The IME consisted of a physical and neurologic examination, which had an observational and physical component. Tr. 476-78. Dr. Hurley described the observational component as noting the patient's affect, mental status, and how well they can communicate and move. Tr. 476-77. Dr. Hurley looked for differences in Kurt's feet including temperature, appearance, or atrophy, but did not observe any dystrophic changes in his feet. Tr. 479. The physical component consisted of Dr. Hurley performing a physical exam on a variety of different systems. For example, Dr. Hurley examined Kurt's reflexes to determine whether there was evidence of nerve injury. He noted the reflexes to be symmetrical. Tr. 477. He performed a straight leg raise to stretch a nerve through its course, particularly in the low back to see if that reproduces or provokes pain, numbness, or tingling. According to Dr. Hurley, the straight leg raise was negative. Tr. 478. Dr. Hurley conducted strength testing, and found Kurt to have normal strength. Tr. 478. Dr. Hurley tested Kurt's range of motion and found it to be excellent. Tr. 478. Dr. Hurley found Kurt's left leg to be normal; however, Kurt reacted to touching on the front part of the right foot. Tr. 479. Dr. Hurley physically examined Kurt's right foot in more detail by applying pressure with his thumb and index finger proximal to his toes, just before the plantar part of Kurt's foot. Tr. 481. Although Kurt expressed pain when Dr. Hurley examined his right foot, Dr. Hurley expected Kurt to express a greater degree of pain in his right foot than

he did during the IME. Tr. 481. The examination also revealed that Kurt had an antalgic gait – in other words, he walked with a limp and complained of pain while walking.

Based on his examination, Dr. Hurley did not find any objective indication of injury that would explain the pain symptoms that Kurt currently reports in his right foot. Tr. 480-81. Dr. Hurley opined that Kurt's pain symptoms were neurologically inconsistent with an aggravation in his lower back. Tr. 485-86. Based on Kurt's subjective description of his right foot pain, Dr. Hurley believed that the injury to his low back would have to go across two nerve levels, L5 and S1. Tr. 482. However, Kurt's reported pain symptoms did not include his calf or heel, areas that would be expected to respond to an S1 nerve injury. Tr. 482. In addition, Dr. Hurley noted that the results of the physical exam during the IME did not correlate with injury in the L5 or S1 area because he could not provoke an aggravation of pain symptoms by stretching Kurt's back or legs and he also could not find a symptom pattern that matched up with a particular nerve branch. Tr. 482-83.

Dr. Hurley found the post-collision MRI and EMG to reinforce his opinion regarding the lack of objective signs of low back injury as the cause of his right foot pain. Tr. 485. Dr. Hurley found nothing in the MRI to suggest such an injury, such as injury or inflammation to the nerve root. Tr. 486. Dr. Hurley also noted that the surgery was performed on the left side resulting in scar tissue on the left side, but no scarring was observed on the right side. Tr. 486. Accordingly, any aggravation to his low back at the site of the scar would be expected to cause pain on the left side. Tr. 488. Dr. Hurley disagrees with Dr. Brown's stretching and disturbance theory because there is no objective evidence of a nerve stretching on the right side such that only the distal portions of both L5 and S1 were affected but nothing else in the right or left leg. Tr. 490-91. Even assuming weakened nerves at the L5 and S1 region, Dr. Hurley thought it would be

difficult to explain how both nerves would be affected just on the right side. Tr. 494. Dr. Hurley also disagrees that the minimal annular tear noted on the post-collision MRI could be the cause of Kurt's right foot pain. Tr. 494-95. The annular tear was noted to be central and left, not on the right. Tr. 495. However, Dr. Hurley conceded that it's possible to have a nerve injury without it being identified by an EMG or MRI.

Dr. Hurley testified that he found the absence of pain symptoms in low back and left leg to be shocking given Kurt's longstanding history of pain in those areas, as noted in his medical records. Tr. 483. However, he admitted that factors such as decreased activity level, increased medication, and no work contributed to the relief of the symptoms in Kurt's low back and left leg. In light of the resolution of Kurt's prior symptoms in his back and left side, Dr. Hurley believes there is a healing process going on and that he may continue to improve. Tr. 499. However, he believes that Kurt is having some pain, that it is possibly neuropathic in nature, and that neuropathic pain can lead to a serious disability in some people. For his own patients with low back and lower extremity pain, Dr. Hurley recommends the same treatments recommended to Kurt's by his own doctors, including medications, injections, a dorsal column stimulator, and physical therapy. Tr. 501-02.

b.      Dr. Leonard Cerullo

Dr. Cerullo is a board-certified neurosurgeon and founder of CINN (now known as North Shore University Health System). Prior to that, Dr. Cerullo was Chairman of Neurosurgery at Rush University Medical Center. Tr. 535. Dr. Cerullo sub-specializes in spinal injury as well as brain and skill-based tumors. Tr. 536. He currently practices at North Shore Medical System. During his 35-year career, Dr. Cerullo has examined thousands of patients with neurologic

disorders of the spine and lower extremities, including those with radiculopathy, neuropathy, and failed back syndrome. Tr. 539.

In preparing his opinions in this case,[6] Dr. Cerullo reviewed some of Kurt's medical records, including records from the University of Chicago up though approximately October 2008, records from Chicago Sports & Spine up through approximately December 2009, a summary of Kurt's medical history and treatment prepared by Dr. Fisher, Kurt's pre- and post-accident MRI reports, an EMG report from November 2007, the IME report prepared by Dr. Hurley, expert reports prepared by Dr. Brown and Dr. Fisher, Dr. Fisher's progress notes from 2010, and Kurt's deposition transcript. Tr. 541-542. Dr. Cerullo has not treated or examined Kurt; his first face-to-face encounter with Kurt was in the courtroom during trial. At the time that Dr. Cerullo reached his opinions in December 2010, the last medical record he reviewed was from February 2009 and he had not reviewed any records related to Dr. Fisher's care and treatment of Kurt after February 2009. He assumed there were no additional records from Dr. Fisher; had he known there were additional records, he would have requested them.

Dr. Cerullo explained that at the L5 level of the spine, motor and sensory messages go to the front part of the shin and the top part of the foot, all the way to the big toe. Tr. 545. The S1 includes the calf muscle and the bottom and outside of the foot. Tr. 545. An injury to the L4-5 usually affects the L5 nerve root, while L5-S1 affects the S1 nerve root. Tr. 545. Upon reviewing the post-collision MRI, Dr. Cerullo noted that there was no change in terms of compression, and a protrusion, if it existed through a tear on the left side, would only cause left-sided pain. A right-sided protrusion would cause a right-sided pain. Tr. 548-49. However, the

---

[6] Defendant retained Dr. Cerullo as an expert witness in this matter. Dr. Cerullo charged $1,600 per hour for trial testimony, $600 per hour for record review, and $800 per hour for telephone conferences and meetings.

tear itself, without protrusion or disc herniation (Kurt's MRI did not show any), would be expected to cause back pain at the site of the tear, not lower extremity pain.  Tr. 548.

Based on his review of Dr. Hurley's IME report, Dr. Cerullo noted that there was significant resolution of left leg, right leg, and low back pain, and that Kurt was left with a relatively small area of persistent pain in his right foot.  Tr. 551.  Dr. Cerullo does not believe that there is a neurologic explanation for Kurt's right foot pain that could be attributed to an aggravation in his lower back.  Tr. 553-54.  Like Dr. Hurley, Dr. Cerullo disagrees with Dr. Brown that the right foot pain could have been caused by a stretching or disturbance of the nerves in the August 2007 collision.  Tr. 554.  Furthermore, even assuming the injury occurred at the S1 nerve root, Dr. Cerullo would not expect Kurt's right heel to be pain free (as Kurt says it is) because that nerve extends from the Achilles tendon on down through (and including) the heel and bottom of the foot to the outside of the foot.  Tr. 557.  He would not expect Kurt's pain symptoms to be as uniquely circumscribed as he reports them to be.  Tr. 557.  However, Dr. Cerullo testified to a reasonable degree of medical certainty that Kurt was injured during the collision on August 7, 2007, and that his right foot symptoms were caused by the collision.

Dr. Cerullo testified that he does not believe Kurt's injuries are permanent because there has been a significant resolution of his other symptoms.  Tr. 551, 556.  Dr. Cerullo believes that Kurt would benefit from physical therapy because he would strengthen the core muscles and learn how to avoid motions that cause the pain.  He also believes that Kurt would benefit from epidural injections to ascertain where the pain is coming from and to reduce the inflammation of the nerve, which would allow for other treatments.  Tr. 558-59.  Like Dr. Hurley, Dr. Cerullo also was surprised by the resolution of all of Kurt's prior pain symptoms in his lower back and

left leg, as noted in the IME report, given that they had been present for such a long period of time.  Tr. 560.

## II.    Analysis

### A.    Applicable legal standards

The Federal Tort Claims Act provides a remedy for personal injuries caused by the negligent or wrongful act or omission of a governmental employee while acting within the scope of her employment.  *Kasongo v. United States*, 523 F. Supp. 2d 759, 791 (N.D. Ill. 2007); see also 28 U.S.C. §§ 1346(b)(1), 2671, 2674.  In FTCA cases, the government is liable in the same manner and to the same extent as a private individual, and the law of the state in which the cause of action arose governs the scope of that liability.  See *United States v. Olson*, 546 U.S. 43, 45-46 (2005); *Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1297 (7th Cir. 1991).  Here, it is undisputed that the substantive law of Illinois applies in this negligence case under the FTCA.

Under Illinois law, to establish negligence, a plaintiff must show that (i) the defendant owed a duty of care to the plaintiff; (ii) the defendant breached that duty of care; and (iii) the defendant's breach proximately caused an injury to the plaintiff.  *Curatola v. Village of Niles*, 154 Ill. 2d 201, 207 (1993); see also *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009).  Defendant United States admits that it breached its duty to Kurt Henriksen when its agent or employee, Dolores Soukup, caused the August 7, 2007 collision.

Defendant cites *Campell v. United States*, 904 F.2d 1188, 1193 (7th Cir. 1990), for the proposition that "if the injury would have occurred even in the absence of the conduct complained of then such conduct was not the proximate cause of the injury."  However, no competent medical testimony or evidence was presented at trial that supports the notion that

absent the collision, Kurt would have developed right foot pain.  Rather, the evidence presented at trial clearly supports the conclusion that the collision proximately caused Kurt's right foot pain—prior to the accident, he did not complain of the pain, while immediately after the accident, he had (and continues to have) constant, disabling pain in his right foot.  Although there was no objective evidence of injury on an EMG or MRI, Drs. Brown, Fisher, and Cerullo all testified to a reasonable degree of medical certainty that Kurt's right foot symptoms were caused by the August 7 collision.  Although there was some difference of opinion at trial as to the location of Kurt's scar tissue—Dr. Cerullo said it was on the left side and therefore would not be expected to cause right-side pain while Dr. Brown testified that the scar tissue was located both left and ventrally, as well as in the front, which could account for right-side symptoms—the fact remains that the injury did not exist prior to the accident and was prominent following.  Unless the Court completely discredited Kurt's testimony along with the testimony of his treating physicians—which the Court is unwilling to do, as it found all three to be credible—the Court could not come to the conclusion urged by Defendant (specifically, that the collision *did not* cause Kurt's right foot pain).

Defendant next argues that if it is found liable for Kurt's right foot injury, the United States should be entitled to a reduction in the award because Kurt failed to mitigate his damages.  See *Tsoukas v. Lapid*, 733 N.E.2d 823, 828 (Ill. App. Ct. 1st Dist. 2000) ("Mitigation of damages imposes a duty on the injured party to exercise reasonable diligence and ordinary care in attempting to minimize his damages after injury has been inflicted") (internal quotations omitted).  Some of Defendant's points on mitigation miss the mark.  First, Kurt was under no legal obligation or duty to undergo steroid injections or have a dorsal column stimulator implanted.  If a "proposed treatment could result in an aggravation of the existing condition or

the development of an additional condition of ill health, or if the prospect for improved health is slight, then there should be no *duty* to undergo the treatment. If the risk is clearly remote, the exception should not apply. But the risk need not be significant or even probable in order to trigger the exception." *Hall v. Dimitru*, 620 N.E.2d 668, 673 (Ill. App. Ct. 5th Dist. 1993). The testimony at trial was that one of the risks of injections is additional nerve injury. Furthermore, the dorsal stimulator would have required Kurt to undergo back surgery, which he was under no legal obligation to do. Because he was not under a duty to submit to injections or a surgically implanted stimulator, his damages cannot be reduced because he refused these particular treatments. However, the testimony at trial indicated that Kurt also made very little effort in regard to physical therapy. There was testimony at trial that physical therapy was a normal treatment for these type of injuries—Kurt's own treating physicians recommended physical therapy—and the Court will consider Kurt's refusal to participate in physical therapy (beyond two failed attempts) in determining the appropriate amount of damages to award.

With respect to the permanency of Kurt's injury, the evidence at trial overwhelmingly supports the conclusion that Kurt was unable to return to work as a lab manager at the University of Chicago. To receive an award for future lost earnings under Illinois law, a plaintiff must prove that his inability to work based on the injury is "reasonably certain" to be endured in the future. See *Brown v. N.W. Trans. Co.*, 516 N.E.2d 320, 327-28 (Ill. App. Ct. 1st Dist. 1987) ("A possibility, or even a reasonable possibility that future pain or suffering may be caused by an jury, or that some disability may result therefrom, is not sufficient to warrant an assessment of [future lost earnings]."). Kurt testified that he was unable to continue working because of the pain that he experiences in his right foot—he was unable to go up and down stairs, unable to carry equipment, set up labs, stay on his feet, or move expeditiously from building to building.

Kurt's testimony was corroborated by his son, who worked with him at the university and observed him both before and after the collision. Dr. John Frederick, Kurt's supervisor, also corroborated Kurt's testimony. Dr. Frederick observed Kurt's ability to do his job before and after the collision and he testified that Kurt's ability decreased significantly after the accident. Kurt's many years of service and excellent record at the University of Chicago, coupled with his age at the time of the accident, add further support to his testimony that he was unable to continue working. Although Kurt continued working for two years following the collision, the Court heard eye-witness testimony regarding how the quality of Kurt's performance decreased over this time period. Although he was able to keep his job, his direct supervisor testified that he was no longer able to do his job as he had done in the past.

In an attempt to discredit Kurt's testimony that he can no longer work, Defendant highlights the fact that Kurt was able to continue working through chronic pain in his lower back and left leg in the four-year period prior to the collision, as well as the fact that Kurt continued to work for over two years after the 2007 collision and received solid performance reviews. However, in light of all the other testimony, the Court views these facts as consistent with the evidence that portrayed Kurt as a hard worker who desired to keep working until the age of retirement and who had a fondness for his job, rather than as a malinger as Defendant suggests. [7]

Furthermore, Kurt's treating physicians, Drs. Brown and Fisher, testified that, in their judgment, Kurt is permanently disabled. Although neither doctor is trained to provide a functional capacity evaluation, their opinions are entitled to weight in assessing whether Kurt's

---

[7] The fact that Kurt continued to receive excellent reviews after the collision does not cast doubt on Kurt's or Dr. Frederick's testimony. Kurt worked for the University of Chicago for almost 25 years, and it is not surprising that his supervisors continued to give him high marks even after the accident. The evidence presented at trial supports the view that Kurt was a valued employee who went beyond the call of duty prior to the accident and who did what he could after the accident, until the pain simply became too much to bear.

disability is permanent and whether he could continue working at the University of Chicago. Based on all this evidence, Plaintiffs have met their burden of demonstrating that it is reasonably certain that Kurt will lose the future wages and benefits that he otherwise would have earned as a lab manager at the University of Chicago had he not been injured in the collision.[8]

The Court also finds Defendant's heavy reliance on the reported pain scores to be misleading. First, the quality of the pain described by Kurt and noted by his doctors was different in nature and extent following that collision. Second, the pain scores prior to the collision referred only to his low back and left leg; following the collision, the pain scores included his right foot.

Defendant also argues that the "suspicious course, and supposed resolution of Henriksen's longstanding pre-accident pain symptoms" suggest that Kurt is overstating the extent of his pain and the impact on his quality of life and ask the Court to apply a significant discount to the non-economic damages sought by plaintiffs. See, *e.g.*, *Snover v. McGraw*, 172 Ill.2d 438, 448 (1996). In *Snover*, the court noted that there was ample reason for the jury to discount much of plaintiff's testimony about the severity or persistence of the injuries that resulted from the accident because the evidence of injury was primarily subjective in nature and not accompanied by objective symptoms. *Id*. at 448-49; see also *Orava v. Plunkett Furniture Co.*, 297 Ill. App. 3d 635, 637-38 (1998) (noting that jury was entitled to discount much of plaintiff's testimony where "plaintiff's treating doctors * * * found no objective signs of injury

---

[8] Defendant points out that Plaintiffs did not offer an functional capacity evaluation in support of their position that Henriksen is totally and permanently disabled. However, Plaintiffs did offer the testimony of Kurt, his family, his supervisor at work, and two treating physicians. In turn, Defendant argues, without sufficient evidentiary support, that Kurt might be able to return to work someday, in some capacity. If Defendant had wanted, it could have had Kurt examined or evaluated for future employment or had Kurt submit to a functional capacity evaluation. Defendant did not take that opportunity and consequently has not sufficiently rebutted Plaintiffs' evidence demonstrating a permanent disability.

that correlated with her various complaints of pain"). These cases suggest that a trier of fact may discount a plaintiff's testimony when the testimony is unaccompanied by objective symptoms.

Defendant's most persuasive evidence on this front was Dr. Cerullo's testimony that the apparent resolution of Kurt's prior, longstanding symptoms was puzzling because the resolution of back-related pain symptoms occur, neurologically, from distal to proximal (foot to leg to back), not the reverse. And Dr. Brown similarly acknowledged that chronic pains associated with degenerative disc disease get worse over time, not better. However, the resolution of low back and left side pain corresponded with an increase in Oramorph from 115mg before the collision to 180mg at the time of trial. It also corresponded with the cessation of his work at the University of Chicago. Although the Court also is puzzled about the total resolution of Kurt's prior pain symptoms, the additional pain medication and rest are at least plausible explanations for the resolution of Kurt's low back and left leg pain. Furthermore, to the extent that Defendant's experts were "surprised" by the resolution of Kurt's pain, part of their reaction can be attributed to the fact that they were not provided with Kurt's medical records from February 2009 through December 2010 (when they rendered their opinions). Thus, as they both admitted during trial, their opinions were hamstrung by the lack of recent records, some of which help to explain the resolution of his prior injuries.

In deciding the appropriate amount of damages to award, the Court will take into account that all of the physicians seemed surprised at the *total* recovery of back and left side symptoms after years of discomfort and pain in that region. However, the resolution of Kurt's low back and left leg pain does not change the Court's determination that Kurt's right foot pain renders him disabled for the foreseeable future.

To accept Defendant's view that Kurt is grossly overstating the nature and extent of his injuries—that is, to accept the view that Kurt is a malinger—the Court would have to believe that Kurt drastically changed his life in an effort to mislead the Court into enhancing an award of damages. Kurt left a job he had for almost 25 years and was valued at; he stopped taking care of his farm, animals, home, and cars; he stopped going on vacations, spending time at his lake house, and doing activities with his wife; he started noticeably limping and using a cane; he stopped driving; and he significantly curtailed several other activities that he had previously enjoyed. Aside from some reservations regarding Kurt's underwhelming efforts at physical therapy and the fact that his low back and left side pain cleared up entirely, the Court found Kurt's testimony, as well as the testimony of Plaintiffs' other witnesses, to be credible. After hearing all of the evidence, while the Court appreciates some of the discrepancies pointed out by Defendant, the Court has no doubt that the collision changed Kurt's life significantly.

Based on the foregoing, the Court concludes that the United States, by and through its agent and/or employee, Dolores Soukup, was negligent in causing the August 7, 2007 collision. The Court further concludes that as a direct and proximate result of the August 7, 2007 collision, Kurt was injured, resulting in temporary increased pain in his low back, left leg, and left foot and the onset of new pain in his right foot. The Court also concludes that the pain and symptoms Kurt experiences in his right foot as a proximate result of the August 7, 2007 collision are likely to continue into the foreseeable future and that Defendant has not rebutted Plaintiff's showing that Kurt's injury is permanent. The Court also concludes that the pain Kurt suffers as a result of the accident leaves him unable to work as a lab manager at the University of Chicago. Finally, the Court concludes that Kurt's injuries—specifically, the pain and the limp that have

accompanied those injuries—have significantly impacted Kurt's life by curtailing the majority of activities Kurt used to enjoy in his time away from work.

**B.      Kurt's Damages**

Damages in FTCA actions may not exceed the amount of a plaintiff's administrative claim.  See *Erxleben v. United States*, 668 F.2d 268, 273 (7th Cir. 1981); 28 U.S.C. § 2675(b). In this case, the administrative claim sought $3,422,618.49 in damages:  $9,618.49 for property damage and $3,413,000.00 for injury to Plaintiff's back and for the pain in his back and both legs.[9]  Kathy Henriksen filed a separate administrative claim seeking an additional $1.5 million for loss of consortium.

Unlike in a jury trial, after a bench trial the trier of fact (the judge) "is required to explain the grounds of his decision" to comply with the dictates of Federal Rule of Civil Procedure 52(a), which imposes a "duty of reasoned, articulate adjudication."  *Arpin*, 521 F.3d at 776. "'This means, when the issue is the amount of damages, that the judge must indicate the reasoning process that connects the evidence to the conclusion.'"  *Id*. (quoting *Jutzi-Johnson v. United States*, 263 F.3d 753, 758 (7th Cir. 2001)).  When faced in *Arpin* with an instance in which the district judge did not comply with Rule 52(a) in explaining the basis for a damage award, the Seventh Circuit flatly stated that "[t]he judge should have considered awards in similar cases, both in Illinois and elsewhere."  *Id*.  In providing that guidance, the Seventh Circuit acknowledged that Illinois law "does not require or even encourage such comparisons" and that in suits under the FTCA, "the damages rules of the state whose law governs the substantive issues in the case bind the federal court."  *Id*.  However, the court of appeals went on to explain that "whether or not to permit comparison evidence in determining the amount of

---

[9]      Kurt claims total damages of $3,544,690.40.  As the court previously ruled, Plaintiffs cannot be awarded damages that would exceed the amount stated in Kurt's administrative claim ($3,422,618.49).

damages to award in a particular case is a matter of procedure rather than of substance, as it has no inherent tendency * * * either to increase or decrease the average damages award." *Id*. Instead, examination of "comparables" only serves "to reduce variance." *Id*. The bottom line, therefore, is that the most recent pronouncement of the Seventh Circuit strongly encourages district courts in cases like this one – negligence actions under the FTCA – to consider damages awards in comparable cases. See, *e.g.*, *Kasongo*, 523 F. Supp. 2d at 804, 807-12 (citing *Jutzi-Johnson* and examining comparable verdicts in determining damages in FTCA case under Illinois Wrongful Death and Illinois Survival Acts).[10] Both *Jutzi-Johnson* and *Arpin* stand for the proposition that a court cannot pluck figures from thin air, but must instead establish a concrete basis for non-economic damages whether through comparable verdicts from various jurisdictions, or by other means, such as using a single-digit multiple of the compensatory damages. *Arpin*, 521 F.3d at 777.

Both parties have submitted a number of "comparables" for the Court's consideration. In their proposed findings of fact and conclusions of law, Plaintiffs highlighted four comparable verdicts in cases that involved injuries resulting in substantial pain and symptoms in the foot that warranted significant awards of non-economic damages. Defendant contends that the cases provided by Plaintiffs for purposes establishing comparable damages awards are skewed because they are factually distinguishable in material respects, both in terms of the nature and extent of the injuries. Defendant maintains that Plaintiffs' comparables neither serve as appropriate

---

[10] The Court draws no distinction between bench and jury trials in regard to its consideration of comparable verdicts. See *Zurba v. U.S.*, 247 F. Supp. 2d 951, 962 (N.D. Ill. 2001) (rejecting the government's argument that "jury verdicts should be used with great caution" in determining comparable damage awards on the grounds that (a) "the government's waiver of sovereign immunity provided by the FTCA allows only for bench trials," (b) "[t]he government has cited no authority for this proposition, nor is the Court aware of any," (c) "in *Jutzi-Johnson*, the Seventh Circuit cited several jury awards as comparable to the claim in that case," and (d) "there is no hard-and-fast rule that juries make higher awards than judges").

comparisons nor support the $2.3 million in non-economic damages sought by Kurt.[3]  The Court addresses each case in turn.

In *Kerns v. Inland Management* (Mich. 1999), the plaintiff (a male in his mid-40's) was awarded a total of $3,800,000.00 for a foot injury where he developed RSD (a pain syndrome), required on-going treatment, and was identified as permanently disabled.  The plaintiff was a longshoreman working aboard a freighter when a hoist collapsed, dropping a load of steel on his foot and crushing it.  He was awarded $3.8 million (which included $1 million in future lost wages, so therefore his non-economic damages award was ostensibly $2.8 million).  The plaintiff in *Kerns* also alleged that the defendant altered or destroyed evidence on three to five occasions.  By comparison, Kurt experiences a localized area of pain in the top and bottom of the upper portion of his right foot purportedly resulting from the aggravation of a weakened nerve in his back; he did not suffer a direct-impact to his foot or crushed-foot injury.  Moreover, Kerns was younger than Kurt at the time of the accident (mid-40s) and was therefore entitled to future pain and suffering over a longer period of time.  The fact that the plaintiff was approximately six to nine years younger than Kurt at the time of the accident does not disqualify the verdict from being instructive to the Court; however, it is a factor to consider in arriving at a damage figure in this case.  Other instructive points from *Kerns* are (i) the fact that the plaintiff had modest medical bills ($15,000), as did Kurt ($10,500), (ii) the fact that neither plaintiff underwent surgery, and (iii) the fact that the plaintiff in *Kerns* suffered from RSD, a neurological condition

---

[3]  Plaintiffs' $2.3 million non-economic damages figure consists of "pain and suffering" ($950,000) as well as "loss of normal life/disability" ($1.35 million).  Although the Court considers these separate categories of damages, for purposes of this discussion they will be taken together because Kurt's purported limitations on his life activities are derived exclusively from his pain symptoms.  Similarly, Defendant's arguments supporting a reduction in non-economic damages apply to both categories, *i.e.*, that Kurt is overstating the extent of his injury and therefore the purported impact on his quality of life.

that results in severel neurological pain without any obvious nerve lesions, symptoms similar to what Kurt experiences in his right foot.

In *Bradburn v. Chrysler Corp.* (Mich. 1996), the plaintiff (a 44 year old male) was awarded a total of $2,120,592 for an injury to his left foot resulting in RSD (a pain syndrome), depression, and permanent disability. Of that $2,120,592, $1,895,799.00 was for pain and suffering. The plaintiff in *Bradburn* suffered a more extensive, direct-impact injury to his foot causing multiple fractures when a crane dropped on his foot, whereas Kurt did not suffer any fractures or broken bones, as indicated by the hospital records from the day of the collision. The plaintiff, several years younger than Kurt, received less than Kurt's request for $2.3 million in non-economic damages. Notably, the spouse of the plaintiff in Bradburn received $38,762 in loss of services, far less than Kathy Henriksen's loss of consortium demand.

In *Griffen v. U.S. Fidelity* (Fla. 2006), the plaintiff (also a 44 year old male) was awarded a total of $2,414,050 for injuries arising after a car accident (in which the defendant admitted liability) that left him with neck, low back, left knee, and left foot pain that caused him difficulty walking, sitting, or standing. He was awarded over $1,000,000 for past and future lost wages and $1,000,000 in pain and suffering. In contrast, Kurt's locus of pain is admittedly more limited—he admits that he no longer suffers pain in his legs or back, only in his right foot. *Griffen* also is distinguishable on the basis that the plaintiff incurred nearly $300,000 in past and future medical expenses, which, if evaluated as a multiplier, would support a higher award for future pain and suffering in comparison to Kurt's more modest medical expenses of approximately $10,808.

Finally, in *Colville v. Crown Equipment* (Penn. 1999), a male plaintiff of undetermined age suffered a foot injury that led to permanent impairment. *Colville* is another case involving a

crushed foot, which occurred in a forklift accident. It also appears to be a record-setting award for a single foot impairment—$3,000,000 for pain and suffering solely for permanent impairment and severe pain in his foot.[11] The comparable also fails to mention the plaintiff's age, significantly curtailing its helpfulness in this case.

Turning to Defendant's comparables, Plaintiffs' primary objection is that Defendant's comparables do not involve the same degree of pain, disability, and lost wages suffered by Kurt. In *Hinds v. Yang* (Maryland 2003), the plaintiff was injured in a car accident. She had a preexisting back condition but alleged a new injury to her back in a different location. The description of the injury is similar to Kurt's—the plaintiff suffered a low back trauma resulting in a permanent right-sided radiculopathy at the L5-S1 level resulting in chronic, permanent low back and leg pain. Her specific symptoms also mirror what Kurt describes—a pain and numbness to the top of the foot and great toe, as well as loss of sensation to the outside of the foot and small toe. However, the *Hinds* opinion does not mention that the plaintiff (i) had daily, severe pain, (ii) needed to use a cane, or (iii) was forced to stop working due to the pain. The 34-year-old plaintiff in *Hinds* received $67,500 for pain and suffering.

In *Mason v. Froio* (N.J. 2008), the plaintiff also sustained an injury to his lower back in a car accident and was subsequently diagnosed with right S1 radiculopathy. The plaintiff's EMG indicated a permanent radiculopathy (Kurt's EMG was negative), which resulted in residual pain,

---

[11] Plaintiffs did not address the remaining cases included in Plaintiffs' compendium of comparable cases in their proposed findings of fact and conclusions of law. See, *e.g.*, *Wimberly v. Bi-Lo* (S.C. 2004) (crushed foot injury caused by a 200-pound grocery store display falling on the plaintiff's foot); *Barbieri v. S. Ocean County Hosp.* (N.J. 1995) (medical malpractice case where the doctor failed to detect and remove glass fragments in plaintiff's foot, causing significant and permanent nerve damage directly in her foot); *Bettinsoli v. John Deere & Co.* (N.J. 2001) (crushed foot injury caused by falling underneath a backhoe where the plaintiff also suffered a herniated disc, femur and tibia fractures as a result of the fall); *De La Cruz v. N.Y. City Transit Authority* (N.Y. 2005) (plaintiff received a $15,000,000 award after she was hit by a bus while crossing the street). Likewise, Defendant does not rely on all of the comparables referenced in its brief. The Court has reviewed all of the comparables in preparing the present opinion, but relies more heavily on the comparables addressed by the parties in their briefs.

tingling, and numbness in his legs and persistent headaches. The plaintiff received a damages award of $74,477.97. In *Suede v. Gibbons Trucking Co.* (Ill. 2008), the plaintiff was involved in an auto collision and suffered multiple rib fractures, a dislocation fracture in her foot, and chronic bilateral foot pain. Suede received a $90,000 damages award for pain and suffering. The plaintiff in *Malec v. Kamper* (Ill. 2002) received $174,000 for pain and suffering from spinal nerve injuries sustained in an auto collision that resulted in a weakness of the legs and permanent impairment. In *Kaufmann v. Pugh* (Maryland 2008), the plaintiff was awarded $250,000 in non-economic damages for injuries resulting from a car accident, where plaintiff aggravated a severe back condition causing neurogenic bladder and bowel, permanent incontinence, peri-anal itch, and tingling sensations in his feet, neck and low back pain. Based on these comparable awards, Defendant contends that the compensation for non-economic damages should be in the range of $70,000 and $250,000. Plaintiffs point out that like *Hinds*, *Mason*, *Suede*, and *Malec* do not mention severe, disabling pain or significant past and future lost wages and thus cannot provide a reliable basis for an award of non-economic damages. Most of Defendant's comparables also do not include descriptions of the nature and extent of the plaintiffs' disabilities. Furthermore, in Kurt's case, his description of his pain was corroborated (to the extent it could be, since pain is a subjective, personal thing) by the testimony of his wife, son, former supervisor, and treating physicians.

Before settling on a figure for non-economic damages, the Court turns to economic damages, which include past medical bills, past lost wages, and future lost wages. The evidence presented at trial puts the economic damage figure somewhere between $746,193.40 and $1,234,783.40, depending on how long Kurt would have continued working as a lab manager at the University of Chicago. Although Defendant argues that the Court should limit the total

award to past and future non-economic damages—and not include an award for future lost wages—the Court is not persuaded by Defendant's position. Plaintiffs put forth ample evidence—including the testimony of Kurt, Kathy, and Gary Henriksen, Dr. Frederick's testimony that Kurt was in considerable pain at that time he quit in January 2010, and his treating physician's testimony that she believed Kurt was disabled—that Kurt was no longer able to work at the University of Chicago as a lab manager (despite trying for two years). Simply put, Plaintiffs met their burden of proving that Kurt was unable to continue working as a lab manager at the University of Chicago as a result of the August 2007 collision. In response, Defendant did not present an expert who could have testified as to other jobs that Kurt could have performed in the community or offer the results of a functional capacity evaluation to counter Plaintiffs' evidence. Instead, Defendant merely points out that Kurt managed to work for two years following the collision and argues that Kurt could have worked in some limited capacity or had teaching assistants assist him in his duties. Defendant's arguments do not overcome Plaintiffs' evidence on this point. The trial evidence supports the conclusion that Kurt enjoyed his job and would have continued working if he could have.

At trial, Kurt testified that he planned on working until he was 70 years old, if his "health held out and everything was good," and Kathy corroborated that testimony. However, during his deposition, he testified that he planned on working until 65 or 70. Taking into account Kurt and Kathy's trial testimony and Kurt's deposition testimony, and also the fact that Kurt suffered from advanced degenerative disk disease in his lower back and from chronic pain symptoms for many years prior to the August 2007 collision, the Court concludes that Kurt would have worked full-time until the age of 65. This conclusion discounts Kurt's trial testimony, which was slightly inconsistent with his deposition testimony, and also accounts for years of back pain and the toll

that had taken on him even prior to the collision. However, the Court acknowledges that the weight of the trial testimony supports a finding that Kurt intended to work until 70. Furthermore, Defendant has not put forth sufficient evidence beyond the discrepancies noted above to cast doubt on Kurt's testimony, nor has it put forth sufficient evidence that Kurt was not likely to work until 70. Kurt's long-time supervisor testified that Kurt could have continued as lab manager until he was 70 years old. Therefore, while the Court will only award Kurt full damages for his diminished earnings capacity up until the age of 65, the Court will award Kurt 50% of his projected earning from ages 65 to 70, which accounts for the distinct possibility that he may have continued working, even in a reduced schedule, until the age of 70.

Based on the foregoing, the Court concludes that an economic damage award of $1,004,766.50 is appropriate. This figure includes the stipulated amount of Kurt's past medical bills ($5,132.00), the stipulated amount of $4,775.00 for damage to his property, and his past and future lost wages ($994,859.50).

In terms of calculating non-economic damages (which encompasses both pain and suffering and disability/loss of normal life experienced and reasonably certain to be experienced in the future), the $2.3 million sought by Plaintiffs is too high. The ratio analysis is not helpful in this case because special damages are typically comprised of quantifiable past expenses attributable to the injury suffered, *i.e.*, medical expenses. Kurt's medical expenses were only around $10,000, which significantly deflates the multiplier. However, the special damages on which Plaintiffs' proffered ratio is based consist almost entirely of future lost wages, which significantly inflates the multiplier. Therefore, in this case, the Court concludes that evaluating comparable verdicts is the more appropriate methodology for calculating a non-economic damages award.

On that basis, cases submitted by Plaintiffs are helpful because they address painful, permanent injuries, and the evidence presented at trial supports a finding that Kurt suffers from a painful, permanent injury. However, the injuries in Plaintiffs' comparables are more readily identifiable and different in scope than what happened to Kurt. The comparables provided by Defendant are more reflective of the scope of Kurt's injury, but fail to take into account the pain associated with and permanency of Kurt's injury. The Court believes the best comparable case—that describes an injury and pain symptoms similar in scope and nature to Kurt's—is *Griffen*, where the plaintiff suffered a herniated disc at L4-5 resulting from an auto accident that caused radiculopathy and neuropathy pain in the plaintiff's neck, low back, left knee, and foot, for which he received $930,000 in non-economic damages. Although Kurt did not suffer a herniated disc in the collision (which would have been an objectively verifiable injury), the *Griffen* plaintiff was younger (44 years old), and past and future medical expenses were shown in *Griffen* to be nearly $300,000 (which would support a higher non-economic award under a ratio analysis), the description of the injury, the plaintiff's symptoms, and the effect on the *Griffen* plaintiff's life all appear very similar to Kurt's situation.

Taking into account (i) inflation (the *Griffen* verdict was reached in 2006), (ii) the fact that Kurt (53 years old) was nine years older than the plaintiff in Griffen (44), (iii) the sizable difference in medical expenses resulting from Kurt's injury (approximately $11,000) and the *Griffen* plaintiff's injury (approximately $300,000), and (iv) the broader scope of the *Griffen* plaintiff's pain (neck, low back, left knee, and foot) compared to Kurt's pain (limited to the right foot), the Court concludes that a non-economic damages award of $800,000 is appropriate. The Court believes that this figure takes into account the localized pain that Kurt constantly feels (and likely will continue to feel) as well as the depression and frustration he has experienced as a

result of the pain. The figure also takes into account Kurt's inability to take care of his house and farm, travel to and enjoy his lake house in Indiana, walk normally and without the assistance of a cane, and enjoy certain aspects of the company of his wife.

### C. Kathy's Loss of Consortium Claim

As suggested by the United States during closing argument, Kathy Henriksen's loss of consortium claim is difficult to quantify. Comparable verdicts offer little guidance, but courts seem to value loss of consortium at roughly 10 to 15% of the injured spouse's total damages. See, *e.g., Griffen*, *Capitano*, and *Kaufmann*. The Court concludes that a similar approach yields a fair and reasonable result in this case and awards Kathy Henriksen $225,595.81 for her loss of consortium claim, which values her claim at 12.5% of Kurt's total damages.

## III. Conclusion

On the basis of the evidence and the expert testimony presented at trial, the Court is persuaded that, in this instance, the collision caused by an employee of the United States on August 7, 2007, proximately caused Kurt Henriksen's injuries, which are both painful and permanent. Accordingly, the Court enters judgment for Plaintiffs and against Defendant on Plaintiffs' negligence claim and awards a total of $2,030,362.30 to Plaintiffs.

Dated:  May 23, 2012

_____
Robert M. Dow, Jr.
United States District Judge